## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**PATRICK F. ANDREWS,**

      **Plaintiff,**

**v.**
                                **Civil Action No. 5:10cv113**
                                **Judge Stamp**

**JAMES N. CROSS, Warden, et al.,**

      **Defendants.**

## REPORT AND RECOMMENDATION

## I.  Procedural History

The plaintiff initiated this case on November 3, 2010, filing a civil rights complaint against the above-named defendant pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), a case in which the Supreme Court created a counterpart to 42 U.S.C. §1983 and  authorized suits against federal employees in their individual capacities. Plaintiff is proceeding *pro se* but not *in forma pauperis.*

On January 3, 2011, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not appropriate at that time.  A summons was issued that same day.[1]

After being granted two motions for extensions of time in which to file their response, on August 8, 2011, the defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment with a memorandum in support, along with a sealed motion to seal exhibits and attachments. The motion to seal was granted August 9, 2011, and a <u>Roseboro</u> Notice was also issued the same day.  On August 31, 2011, the plaintiff filed his response in opposition, styled "Memorandum of Law, Constitutional Rights, Civil Rights under 5th, 8th, and 14th Amendments,

---

[1] An Order regarding preliminary review and service of process was later entered, directing that the Clerk re-issue a 60-day summons and forward to the plaintiff for service, because he was not indigent and therefore was not entitled to court-ordered service of process via the U.S. Marshal Service.  (Dkt.# 12)

B.O.P. Policy and, B.O.P. Prisons and Prisoners Administrative Law [sic]." Accordingly, this case is before the undersigned for a report and recommendation on the defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment and the plaintiff's Motion for Summary Judgment.

## II.  The Complaint

At all times relevant to this complaint, the plaintiff was a federal prisoner incarcerated at USP Hazelton ("Hazelton"), located in Bruceton Mills, West Virginia.  The plaintiff is suing the defendants in their individual capacities.  His complaint alleges that the defendants were deliberately indifferent to the cruel and unusual punishment they subjected him to when they deprived him of basic human needs, verbally abused him, threatened him with coercive force, used excessive force against him, and were deliberately indifferent to his serious medical needs, all in violation of his Due Process, equal protection, Fifth, Eighth and Fourteenth Amendment Rights, a Federal Bureau of Prisons ("BOP") program statement, and several federal regulations. He attaches a number of documents in support of his claims.[2]

Specifically, the plaintiff alleges that while he was housed in the Special Housing Unit ("SHU"), he was threatened with mace if he did not cooperate, then transferred to a SHU multi-purpose room, where he was forced to live for 44 days under inhumane and degrading conditions.

The plaintiff elaborates on his claims by stating that on May 16, 2009, while housed in the SHU, he was placed a multi-purpose room because he refused a cell mate who he suspected of being a "snitch," under orders from the defendants who were investigating him.[3]  While there, he was only

---

[2] Attached are: copies of grievances filed to prove his exhaustion of his administrative remedies; 73 pages of copies of U.S. D.O.J.  and B.O.P. Program Statements regarding inmate discipline and special housing units; copies of letters he alleges he wrote to defendant Warden James N. Cross; Glenn Fine, Inspector General at the Justice Department; to Eleanor Holmes Norton, Congress of the U.S. House of Representatives, with a response letter in return; and a letter to Kim White, B.O.P. Regional Director of Mid-Atlantic Regional Office; and a letter to defendant Warden James N. Cross from plaintiff's defense counsel, Harry J. Trainor, Jr., Esq.

[3] Plaintiff, already convicted of murder, was being investigated for his involvement in the fatal assault of another inmate at Hazelton and was facing the death penalty at the time.

given a mattress on the floor, no privacy when toileting, and had no access to running water[4] or a regular toilet.[5] He remained there for 44 days, until July 9, 2009. He alleges that at least once during that time, the defendants failed to empty his "toilet," leaving him confined overnight in the room with a bag of feces. He avers that, in an attempt to avoid having to defecate under these 'degrading' conditions, he limited his intake of food and fluids, and did not defecate at all for four weeks. He claims that when he became ill as a result, he was denied medical care. He alleges that as a result of these constitutional deprivations, he suffered mental anguish, emotional distress, and significant impairment of bodily function.

As relief, the plaintiff seeks $30,000.00 in "monetary," punitive and compensatory damages from each defendant, as well as declaratory relief.

### III. <u>Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment</u>

In support of their Motions, the defendants include a 350-page motion to file unredacted documents under seal, with attached copies of plaintiff's inmate housing quarters history, medical records and administrative grievances, as well as affidavits from themselves, asserting that:

1. The plaintiff has been designated to Hazelton since April 16, 2006;[6]

2. he is serving a life sentence with a minimum term of thirty-five years and twenty months for murder;

3. he was repeatedly in and out of the SHU throughout his time at Hazelton, until on October 7, 2007, after being involved in the fatal assault of another inmate, he was placed in the SHU permanently, where he remains, pending his transfer to another institution after the conclusion of the legal proceedings regarding the inmate's death.

4. On May 26, 2009, because the plaintiff refused to accept a cellmate in his SHU cell, he was moved from SHU cell 128 to a multi-purpose room, to accomplish two goals: his request

---

[4] The plaintiff concedes that he was given "cups of water" to clean his hands with after toileting.

[5] He alleges that he was given hospital urinal to void in, and a milk crate with plastic bag liners to use as a toilet for defecation.

[6] The plaintiff was briefly designated to the Federal Transfer Center in Oklahoma City, OK, from March 25 – April 7, 2008.

not to have a cellmate, and the institution's need to house inmates in SHU for administrative detention or disciplinary segregation.

5. Multi-purpose rooms in SHU at Hazelton are not used for punishment; they are used for overflow or alternative housing during periods of SHU overcrowding.

6. Pursuant to B.O.P. policy, inmates must be rotated to different cells at least every 21 days while housed in the SHU and each cell rotation must be documented. Accordingly, on June 17, 2009, SHU staff attempted to assign plaintiff to another cell, but plaintiff again refused the assignment, and was assigned again to the multi-purpose room as a result.

7. SHU staff attempted again to transfer the plaintiff to a different cell on July 6, 2009; plaintiff again refused to be housed with another inmate and as a result, was reassigned back to the multi-purpose room.

8. The plaintiff remained in the multi-purpose room until July 9, 2009, when SHU staff assigned him to cell 130. Plaintiff was away from Hazelton on a writ from July 29 – October 9, 2009, when he returned and was placed back in a cell in the SHU, where he remained at the time of the defendant's August 8, 2011 response.

9. While in the multi-purpose room, the plaintiff was given a hospital urinal, bags to defecate in, a mattress with built-in pillow; blankets and linens; and the personal property and personal hygiene items he had had in his cell.

10. Plaintiff's Eighth Amendment violation allegations lack merit.

11. Plaintiff's due process and/or equal protection claims lack merit.

12. The defendants are entitled to qualified immunity.

13. Claims against the defendants in their official capacities must fail.

14. Constitutional violation claims cannot be based on *respondeat superior.*

## IV. Plaintiff's Response

In response to the defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, the plaintiff reiterates in greater detail the allegations in his complaint; and provides case law which he believes refutes each of the defendant's claims for why this matter should not be dismissed. He attaches a copy of a June 11, 2009 letter from one of his defense counsel as well as an affidavit from that same attorney, attesting to his version of the facts; a copy of the medication he contends he was prescribed to treat the serious gastrointestinal injury he sustained as a result of not defecating for four weeks; a copy of P.S. 5270.07, "Conditions of Disciplinary Segregation §541.21;

4

and an affidavit of his own, in which he contends, in pertinent part, that as a consequence of his

living conditions during the 44-day stay in the multi-purpose room, he

> went (4) weeks without relieve [sic] of myself. Causing Bloating of my stomach, constipation, headaches, change in sleeping patters [sic] (staying up for two days at a time), exertion, dehydration, dizziness, nausea, with extreme sensitivity to touch, light, smell and sound. With lower back spasm/pains, from laying on a mattress on the floor. I suffered throbbing pain on one side of my head and stomach for weeks. Yet still to this day, I have painful gas/abdominal reactions occurring by reason of this incident.
>
> I complained about my conditions and wrote letters when feeling up to part. [sic] I also complained to the (SHU) P.A. during sick call, and on SHU rounds. Only being told to "drink water and follow the program to get out of the multi-purpose [sic] room, and I've been signed up to see the doctor". [sic] I complained to the Warden, Assistant Warden, Counselor and Psychology services about my pain and suffering with suicidal thoughts due to my conditions.

(Dkt.# 39-3 at 2).

## V. <u>Standard of Review</u>

### A. <u>Motion to Dismiss</u>

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. <u>Mylan Labs, Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir.1993); <u>see also</u> <u>Martin</u>, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," Id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir.2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

**B. Summary Judgment**

Pursuant to Rule 56c of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. V. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 *1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita at 587 (citation omitted).

## VI. Analysis

### A. Exhaustion of Administrative Remedies

It is undisputed that plaintiff has exhausted his administrative remedies with regard to his claims.

### B. Excessive Force

The use of excessive force may constitute cruel and unusual punishment. Hudson v. McMillian, 503 U.S. 1 (1992). In proving such a claim, while the extent of any resultant injury is both material to the question of damages and useful in determining the likely degree of force applied,

a significant injury is not in and of itself determinative of whether such a claim survives. Wilkins v. Gaddy, 130 S.Ct. 1175, 1178 (2010) *quoting* Hudson v. McMillian, 503 U.S. 1, 4 (112 S.Ct. 995, 117 L.Ed. 2d 156 (1992). The "'core judicial inquiry' . . . is not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins, *supra* at 1178, *quoting* Hudson, *supra* at 7. Because "not . . . every malevolent touch by a prison guard gives rise to a federal cause of action," a *de minimis* application of force will not result in a constitutional violation. Hudson, *supra* at 9; see also Wilkins, *supra* at 1177 - 1178 ("An inmate who complains of a push or a shove that causes no discernible injury almost certainly fails to state a valid excessive force claim.") (internal quotation marks omitted). Where the force applied is excessive, however, a constitutional claim may survive summary dismissal even if the resulting injury is *de minimis*. Wilkins, *supra* at 1180. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, *supra* at 9-10.

**1. Defendants Warden James N. Cross, Captain Thomas E. Bergami, and Lt. Albert Vero**

Plaintiff alleges that upon his May 26, 2009 refusal to accept a cellmate, he was told by defendants Bergami ("Bergami") and Vero ("Vero") to "cuff up, and if you don't cuff up there's no other choice but the spray mace and use force." Defendant does not allege that he actually was sprayed with mace, merely that he was threatened with it if he did not cooperate. He alleges that defendant Warden James N. Cross ("Cross") "permissioned" and condoned the behavior of Bergami and Vero, by doing nothing about it.

Both defendants Bergami and Vero deny that they spoke harshly to and/or used profanity toward the plaintiff. However, even if they had, it is undisputed that verbal abuse or verbal harassment by guards, without more, is insufficient to state a constitutional deprivation. Siglar v. Hightower, 112 F.3d 191, 193 (5th Cir. 1997) (verbal abuse by a guard does not give rise to a cause of

action under § 1983); <u>McBride v. Deer</u>, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001) (acts or omissions resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment); <u>Morrison v. Martin</u>, 755 F.Supp. 683, 687 (E.D.N.C.)(words by themselves do not state a constitutional claim, without regard to their nature), aff'd 917 F.2d 1302 (4th Cir. 1990). Because plaintiff does not allege that he actually was sprayed with mace, merely that he was threatened with it if he did not cooperate, he has suffered no injury, *de minimis* or otherwise. Accordingly, plaintiff's Eighth Amendment Claim against Bergami and Vero should be dismissed. Because there was no wrongdoing by Bergami and Vero, Cross cannot be found to have condoned their wrongful behavior.

Regarding plaintiff's allegation of excessive force, the B.O.P.'s policy on the use of force is governed by C.F.R. § 552.22; the use of force is authorized in the following situations: (1) in defense or protection of self or others; (2) in enforcement of institutional regulations; and (3) in the prevention of a crime or apprehension of one who has committed a crime. C.F.R. § 552.22 (c)(1-3). The undersigned finds that the plaintiff's propensity for acting out, as reflected in the exhibits, created an apparent need to control his actions.[7]

Therefore, the question remains whether the amount of force used by the correctional officers was reasonable and necessary under the circumstances to control the plaintiff's behavior. <u>Graham vs. Connor</u>, 490 U.S. 386 (1989). The B.O.P. has guidelines concerning the amount of force which may be utilized by its officers. The use of force available to B.O.P. correctional officers range from an

---

[7] The plaintiff's attached medical records reveal that staff was required to "O.C." spray him in order to obtain control over his behavior more than once. Notes within the medical records attached to plaintiff's complaint indicate that on March 14, 2009, he was in a fistfight with another inmate (Dkt.# 1-4 at 4); on December 31, 2009, he was seen in a B.O.P. Health Services Clinical Encounter after an "immediate use of force" in which he sustained no injury (Dkt.# 1-4 at 18); on January 18, 2010, he was involved in a "forced cell move with O.C. spray" in which he sustained no injury (Dkt.# 1-4 at 20); on January 30, 2010, he was again involved in "[u]se of force with gas SHU Range 1 cell 103," where he complied with restraints after use of the gas (Dkt.#1-4 at 22); and on February 27, 2010, he sustained a small superficial abrasion on his wrist from pulling against his restraints when he "received gas from a calculated use of force in cell 103 range 1 SHU," (Dkt.# 1-4 at 24). In a June 17, 2010 B.O.P. Clinical Encounter Administrative Note, recommending an abdominal x-ray, there is a caution: "NOTE: CAUTION – INMATE IS A 3 MAN HOLD PLUS LIEUTENANT." (Dkt.# 1-4 at 40).

officer's presence and verbal commands to the use of deadly force. It is clear from the sequence of events on May 26, 2009, that the mere presence of officers and verbal commands were effective in controlling the plaintiff's behavior that day. As documented by the Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment as well as the plaintiff's own medical records, the plaintiff has a long history of violence and disruptive behavior. Given those facts, and the plaintiff's behavior on the day in question, it is clear that the amount of force used by the correctional officers was both reasonable and necessary. Furthermore, the undersigned finds that a minimal level of force was used to control the plaintiff's behavior.

It is clear from the record that the force utilized to control the plaintiff was done so in a good faith effort to maintain a safe and orderly control of the facility and was not used maliciously and sadistically with the intent of causing harm. Furthermore, as previously noted, the plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is *de minimis.* Here, the plaintiff admits he suffered no injury. Accordingly, he has failed to state a claim upon which relief can be granted against defendants Bergami, Vero and Cross.

**C. Deliberate Indifference**

The undersigned has viewed the plaintiff's complaint as stating a claim under the Eighth Amendment which prohibits punishments that "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103 (1976)(*quoting* Gregg v. Georgia, 428 U.S. 153, 173 (1976)). Accordingly, under the Eight Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 753 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), *quoting* Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard, and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. <u>Wilson v. Seiter</u>, 501 U.S. 294, 297-99 (1991). A sufficiently serious deprivation occurs when a "prison official's acts or omission . . . result in a denial of the minimal civilized measure of life's necessities." <u>Id</u>. at 298. Thus, while "'the Constitution does not mandate comfortable prisons,'" it also "does not permit inhumane one." <u>Id</u>. (quoting <u>Rhodes</u>, 452 U.S. at 349).

**1. Conditions of Confinement in the SHU's Multi-Purpose Room**

**A. Defendants Officer Leo Reilly; Officer Eric Phillips; Eric Griffin, Counselor; Warden James N. Cross; and Ass't. Warden Roy C. Cheatham**

The plaintiff alleges that for forty-four days, the defendants deliberately deprived him of basic human needs, by keeping him in a room without a standard toilet, running water, and a regular bed. Although he admits he is presently being prosecuted for his involvement in a murder of another inmate at Hazelton, he asserts that he "was not a security risk," and the defendants are only alleging that he was "to justify matters and excessive use of force."

Plaintiff contends that on May 26, 2009, after he was escorted to the multi-purpose room, Officer Leo Reilly ("Reilly") gave him the milk crate with plastic bags to use as a toilet for defecation, and the urinal, along with the rest of his property and a mattress. He avers that in doing so, Reilly deprived him of a liberty interest and a civilized basic human need, in violation of his due process, Eighth and Fourteenth Amendment rights.[8]

_____

[8] Reilly's Declaration states he has no specific memory of the plaintiff's placement in the multi-purpose room but concedes that the room is commonly used for that purpose when the SHU is overcrowded; that inmates confined there are given all their hygiene products, bedding, personal property, a hospital urinal and bags. Moreover, since there was no running water, inmate requests for water or to have their urinals emptied are accommodated as soon as practicable. (Dkt.# 33-14 at 1).

Plaintiff alleges that while housed in the SHU's multi-purpose room on June 1, 2009, at about 10 p.m., Officer Eric Phillips ("Phillips") refused his request to remove and dispose of a bag of feces, deliberately leaving the waste in the multi-purpose room with him all night. He contends that this was so malodorous and stressful it caused him to vomit several times.[9]

Plaintiff's complaint makes no specific allegation against defendant Counselor Eric Griffin, ("Griffin"), other than to briefly imply, without elaboration as to details, date, time, or outcome, that he disclosed his "pain and suffering with suicidal thoughts due to my conditions" to Griffin, along with defendants Warden James N. Cross and Assistant Roy C. Cheatham. In his response to the defendants' motion to dismiss, plaintiff seizes on Griffin's admission in his sworn Declaration that there was no running water or toilet in the multi-purpose room, construing it as Griffin's agreement that the plaintiff was being confined in inhumane conditions. (Dkt.# 39 at 23).[10]

Plaintiff alleges that defendant Cross permitted him to remain in the inhumane conditions in the multi-purpose room; that he gave Cross a hand-written letter, detailing his complaints about the multi-purpose room while he was housed there during one of Cross' weekly SHU administrative walk-through/rounds by executive staff but that Cross ignored it, as well as a letter sent to him by plaintiff's defense counsel. He attaches a copy of a June 1, 2009 letter he purportedly gave to Cross. (Dkt.# 1-3 at 4-6).[11]

---

[9] Phillips' Declaration denies the incident, stating that he always responded in a timely manner to such requests, noting that if he had not, because the multi-purpose room is directly across from the Officer's Station, the odor would have been readily apparent there, and it was never an issue. (Dkt.# 33-13 at 1-3).

[10] Griffin's Declaration says no such thing. His Declaration merely states that he visited the plaintiff weekly during the relevant time period to arrange legal phone calls to plaintiff's defense counsel, incident to plaintiff's then-ongoing prosecution for the October 7, 2007 incident at Hazelton; despite the fact that there was no toilet or running water in the multi-purpose room, he never saw the plaintiff in deplorable conditions below B.O.P. standards; and never witnessed the plaintiff's having to live with feces or urine in his room. (Dkt.# 33-12 at 1-2).

[11] Cross's Declaration asserts that he does not recalls receiving any letter, but he did recall Andrews' placement in the multi-purpose room because of overcrowding in the SHU, not because of punishment, and Andrews' refusal to accept a cellmate. He averred that if he had observed Andrews being treated improperly, or if Andrews had voiced concerns about his living conditions, they would have been addressed immediately. (Dkt.# 33-9 at 1-2).

Plaintiff alleges that he expressed "verbal informal resolution" of his complaints about placement in the multi-purpose room to defendant Assistant Warden Roy C. Cheatham ("Cheatham"), to no avail.[12]

A liberal reading of the plaintiff's complaint indicates that he is alleging that his involuntary confinement in protective custody violated his Eight Amendment right to be free of cruel and unusual punishment as well as his right to due process. However, the record establishes otherwise.

First, it is important to acknowledge again that prison officials have a mandatory duty "to take reasonable measures to guarantee the safety of the inmates." Hudson, *supra.* The Fourth Circuit has specifically ruled that placing an inmate in protective segregation does not violate the Eighth Amendment so long as there is a rational relationship between the restrictions and the desired objective of ensuring the inmate's safety. Taylor v. Rogers, 781 F.2d 1047, 1050 (4th Cir. 1986). Given the fact that prison officials were aware that plaintiff was a security risk, placement in segregation was rationally related to the ultimate objective of keeping the plaintiff separated from other inmates to the extent possible, given the overcrowded conditions at the facility.

Because the plaintiff's claims are directed at federal employees, the Fifth Amendment applies in determining his due process claim. See Berry v. City of Muskogee. 900 F.2d 1489, 1492 n. 2 (10th Cir. 1990) (Fifth Amendment protects against deprivations of life, liberty, or property by federal government). Due process questions are examined in two steps. First, it must be determined whether the government has interfered with a liberty or property interest. Second, if the government has interfered with such an interest, it must be determined whether the procedures which led to the deprivation were constitutionally sufficient. Kentucky Dept't of Corrections v. Thompson, 490 U.S.

---

[12] Cheatham's Declaration states that he made weekly rounds in the SHU with other members of the executive staff, observing conditions of the inmates and the unit, answering questions from inmates or directing the questions to appropriate staff. He denied recalling speaking with the plaintiff, but asserted that if plaintiff's conditions had been 'deplorable,' he would have noticed it. He did not notice anything unusual, inhumane, or unpleasant-smelling about the plaintiff's room, or he would have ordered the situation to be rectified, and specifically denied ever seeing the plaintiff housed in conditions that were below B.O.P. standards. (Dkt.# 33-11 at 1-2).

454, 459 (1989) (citing Board of Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972))

(applying 14th Amendment); Hewitt v. Helms, 459 U.S. 460 (1983).  In making this inquiry, case law

under 42 U.S.C. § 1983 is applicable to Bivens actions.  See Butz v. Economou, 438 U.S. 478, 504

(1978).

 The United States Supreme Court has held that prison inmates do not have a liberty interest

in a certain prison classification arising from the Due Process Clause itself.  Hewitt, *supra* at 468.

"[T]ransfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is

well within the terms of confinement ordinarily contemplated by a prison sentence." Id. at 467.

Therefore, under the Due Process Clause itself, the plaintiff did not have a right to any hearing or

other procedural safeguards before he was moved to detention in the SHU's multi-purpose room.

 Furthermore, to the extent that the plaintiff may be alleging that officials at Hazelton violated

policy statements and operating procedures in holding him in the SHU's multi-purpose room, he

again fails to state a due process claim.  A Bivens action "must be founded upon a violation of

constitutional rights," Arcoren v. Peters, 829 F.2d 671, 676 (8th Cir. 1987), and "a failure to adhere to

administrative  regulations does not equate to a constitutional violation."  Hovater v. Robinson, 1

F.3d 1963, 1068 n. 4 (10th Cir. 1993).

 Finally, in Sandin v. Conner, the Supreme Court held that regulatory language does not

create a liberty interest unless the language regulates the imposition of "atypical and significant

hardship . . . in relation to the ordinary incidents of prison life." 515 U.S. 472, 485-86 (1995).

Although without question, the conditions in the SHU's multi-purpose room are more restrictive and

austere than those the plaintiff enjoyed in his private cell in the SHU, these conditions are within "the

range of confinement to be normally expected for one serving" a federal prison sentence.  Id. at 487.

The plaintiff has cited nothing which demonstrates a significant hardship.  Therefore, the plaintiff's

placement in a private multi-purpose room within the SHU did not affect a constitutionally protected

liberty interest, and he had no right to any level of due process before he was placed there or while he was maintained there.

Additionally, plaintiff's conditions while in custody in the SHU's multi-purpose room did not violate the Eighth Amendment's prohibition against cruel and unusual punishment. To show an Eighth Amendment violation, the plaintiff must demonstrate (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials. See Strickler v.Waters, 989 F.2d 1375, 1379 (4th Cir. 1993), cert. denied 510 U.S. 949 (1993). Additionally there must be evidence of a "serious medical and emotional deterioration attributable to the challenged condition." Id. at 1380 (quoting Lopez v. Robinson, 914 F.2d 486, 490 (4th Cir. 1990)).

A thorough review of the record reveals that plaintiff was placed in the SHU's multi-purpose room to accomplish two goals: to accommodate his request for no cellmate and to facilitate the prison's overcrowding and need to house inmates in SHU for administrative detention or disciplinary segregation. Plaintiff was provided with all of the basic necessities for daily living; although the accommodations may not have been to his liking, he was never deprived of food, clothing, shelter, sanitation, medical care and personal safety. His personal items were brought from his cell. He was given a mattress with an attached pillow, a makeshift toilet and a means to wash his hands when necessary. He does not allege he was ever denied the opportunity to bathe, only that he did not have ready access to a shower whenever he wanted one. When another single cell became available in the SHU, he was transferred back there. Plaintiff was adamant that he did not want a "cellie," because he was afraid that he would be housed with an inmate who was a "plant" or "snitch," to facilitate the prison's investigation of the October 7, 2007 murder at Hazelton. It appears from the record that the defendants, despite plaintiff's accusations of deliberate indifference, were as responsive to his needs as much as possible, given the circumstances.

Plaintiff has neither shown a "sufficiently serious" deprivation under an objective standard, nor that prison officials acted with "deliberate indifference" to his health and safety under a subjective standard. Wilson v. Seiter, *supra* at 297-99. Therefore, there was no violation of the plaintiff's Eighth Amendment rights, and because the plaintiff has made no showing that his confinement in the SHU under protective custody violated his right to be free from cruel and unusual punishment, this claim should be dismissed.

Finally, the Fourth Circuit has held that a prisoner's equal protection rights are not violated by involuntary placement in protective custody, reasoning that "the difference in treatment among prisoners in protective segregation and the general population has a substantial, rational basis in the legitimate interest of prison security." Allgood v. Morris, 724 F.2d 1098, 1101 (4th Cir. 1984). In reaching this decision, the court reasoned that "[p]rotective segregation is offered to inmates for their safety, the safety of others in confinement, and to insure institutional security and order. To allow prisoners in protective segregation to enjoy all of the same privileges to the same degree as those in the general population would eviscerate the value of protective segregation." Id. at 1100-1101.

Therefore, the plaintiff's Eighth and Fourteenth Amendment and due process rights were not violated by his involuntary but temporary placement in the SHU's multi-purpose room. Accordingly, this allegation also fails to state a claim upon which relief can be granted against any of the defendants.

**2.  Deliberate Indifference to a Serious Medical Condition**

To succeed on an Eighth Amendment "cruel and unusual punishment" claim, a prisoner must prove two elements: (1) that objectively, the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively, the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991). To state an Eighth Amendment claim for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to a serious medical need. Estelle v. Gamble, 429 U.S. 97, 104 (1976).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. <u>Gaudreault v. Municipality of Salem, Mass.</u>, 923 F.2d 203, 208 (1st Cir. 1990), <u>cert. denied</u>, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. <u>Monmouth County Corr. Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3rd Cir. 1987), <u>cert. denied</u>, 486 U.S. 1006 (1988).[13]

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. <u>Wilson</u>, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence. <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial of nonexistent." <u>Id.</u> at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir.

---

[13] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. <u>Webb v. Prison Health Services</u>, 1997 WL 298403 (D. Kan. 1977). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. <u>Veloz v. New York</u>, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. <u>Brice v. Virginia Beach Correctional Center</u>, 58 F.3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. <u>Browning v. Snead</u>, 886 F.Supp. 547 (S.D. W. Va. 1995). And arthritis is a serious medical condition because it causes chronic pain and affects the prisoner's daily activities. <u>Finley v. Trent</u>, 955 F.Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. <u>Johnson v. Quinones</u>, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. <u>Clinkscales v. Pamlico Correctional Facility Med. Dep't.</u>, 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). Under the proper circumstances, a ventral hernia might be recognized as serious. <u>Webb v. Hamidullah</u>, 281 Fed. Appx. 159 (4th Cir. 2008).

1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003)).

Here, the plaintiff alleges that during his 44-day stay in the multi-purpose room,

> plaintiff was advised to put a sick-call slip in for his medical reasons. The presents [sic] of Captain Thomas Bergami and Health Services during SHU Administrative Rounds were made clear of the purpose Plaintiff's living conditions. Plaintiff's constipation complaints before housed in multi-purpose room were heighten [sic] with depressive measures and pains during his stay[.]

(Dkt.# 39 at 9).

He does not offer specifics as to when this occurred, but contends that, after submitting the sick-call slip, he was "seen by a nurse 5 days later being removed from those deplorable living conditions.[14]

It is clear from the record that plaintiff has been permanently housed in the SHU since October 7, 2007. The medical records attached to plaintiff's complaint reflect that medical attention was always available to him, and was repeatedly provided upon request, while he was housed in there.[15] Despite that, and despite petitioner's wildly improbable (and physically impossible) claim of not defecating for four weeks, nothing in plaintiff's medical records reflects that he ever requested

---

[14] On July 14, 2009, five days after being released from the multi-purpose room he sought medical attention for "c/o (complaints of) h/a's (headaches) on/off for 2 days. No nausea/vomitus, no chills/fever." (Dkt.# 1-4 at 9). There was no mention of any complaint of any gastrointestinal issue, let alone a complaint of not defecating for four weeks or feeling suicidal.

[15] On March 18, 2010, he was "seen at SHU cell door" for complaints of "a lot of gas . . . bloating of stomach . . . [and] some headaches." (Dkt.# 1-4 at 27). On May 5, 2010, he was seen "ambulatory at the SHU cell door" for lower back pain . . . Hx of MVA in remote past. [Back pain] . . . going on for one year . . . also recurrence of gas. (Dkt.# 1-4 at 31). And on June 17, 2010, "[d]uring exec rounds today, inmate again complained about gassiness, bloating, etc." (Dkt.# 1-4 at 40).

medical attention for *any* reason during the relevant time period between May 16 – July 9, 2009.[16] Despite plaintiff's allegation that his failure to defecate for four weeks caused serious impairment of bodily function and emotional injury, he has neither provided any facts to substantiate his claim, nor proven that the defendants were ever deliberately indifferent to his allegedly serious medical needs.

The plaintiff asserts that to avoid the humiliation of being forced to defecate in plastic bags, he tried to avoid eating and drinking, in order to avoid defecating at all. Consequently, he claims he did not have any bowel movements for a month, and as a result, suffered the symptoms referred to *supra,* claiming that that "to this day (ongoing and continuing) . . . [he] takes medications and/or treatment from the incident in the Complaint[.]" (Dkt.# 39 at 1).

A thorough review of his complete medical records attached to the Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment, indicates that plaintiff does indeed take medications for gas and bloating.[17] However, his first complaint of those symptoms after his July 9, 2009 release from the multi-purpose room was not until over eight months later, on March 18, 2010.[18] More importantly, the records *also* reveal that he had a pre-existing history of constipation, gas, bloating, and abdominal discomfort, and sought treatment for them long before he was ever placed in the multi-purpose room on May 26, 2009.[19] His first request for any medical treatment

---

[16] Nor did plaintiff make any mention, in any of his grievances filed regarding being housed in the multi-purpose room, beginning on May 27, 2009 (Dkt.# 1-1 at 2) until February 14, 2010 (Dkt.# 1-1 at 17), of any issue regarding being unable to defecate, let alone not defecate for four weeks, or of suffering any physical or emotional injury at all as a result.

[17] In 2010, plaintiff was taking daily simethicone (brand names Alka-Seltzer or Gas-X) for "flatulence, eructation, and gas pain (Dkt.# 33-7 at 27) and ranitidine (brand name Zantac) for heartburn for "stable GERD [gastroestophageal reflux disease]." (Dkt.# 33-7 at 2 and 21).

[18] The medical records also reveal that both of the anti-depressants, Desyrel (trazodone) and Effexor (venlafaxine) that the plaintiff began taking after his release from the multi-purpose room, have, according to their "Consent(s) to Use of Miscellaneous Antidepressant Medications," side effects that were disclosed in writing to plaintiff that include, *inter alia,* constipation, headache, insomnia and sleep disturbances. (Dkt.# 1-4 at 75 and 76), which may be contributing to plaintiff's continuing gastrointestinal issues.

[19] January 8, 2009: plaintiff complained of "no BM for 2 weeks" and was given milk of magnesia (Dkt.# 33-8 at 27); on February 24, 2009, he complained of constipation lasting more than 7 days and milk of magnesia was given

after his release from the multi-purpose room was five days later, on July 14, 2009, when he complained of headaches "on/off for 2 days" and was given Ibuprofen. He made no mention at the time of any gastrointestinal issues, let alone a failure to defecate for four weeks, specifically denying nausea, vomiting, chills or fever. (Dkt.# 33-8 at 16 – 17). As for his complaints of "exertion, dehydration, dizziness, nausea, with extreme sensitivity to touch, light, smell and sound," there is not one reference within any of his medical records, before or after the relevant time period, of him ever complaining of any of these symptoms.

Moreover, as for the depression, suicidal thoughts and anxiety plaintiff alleges he suffered while in the multi-purpose room, there is nothing in his medical records to support a finding that he ever voiced complaints about these issues during the relevant time period. Rather, the first instance of mention of depression in his medical records was eight and a half months later, when a March 26, 2010 B.O.P. Psychology Data System note stated "Inmate reports "bouts of depression" and "anxiety attacks." Her [sic] states he has difficulty sleeping and stomach upset. Stressors include prosecution and ADX referral.[20] Please consider medication to treat these symptoms. Thanks. *Signed* Jeffrey Hammond, CLH Psych." (Dkt.# 33-5 at 46). Shortly thereafter, the plaintiff was begun on antidepressants. A May 5, 2010 hand-written request from him to one Dr. Dobushak at the prison, stated

> I talked to you about *this medication my family has history with. For the same symptoms of depression, anxiety, sleeplessness, tension and chronic pain. "Trazodone," is and will be more effective for me.* The current medication is not working. Please start me on Trazodone[21] as soon as possible.

(Dkt.# 33-8 at 28); on April 8, 2009, he complained of constipation lasting 6 days, and milk of magnesia was given (Dkt.# 33-8 at 32); on March 16, 2010, complained of "bloatness [sic] in my stomach and mygrain [sic] headaches *the same feeling as almost a year ago*." (Dkt.# 33-5 at 48) (emphasis added).

[20] Plaintiff was facing the prospect of the death penalty and/or transfer to a "super-max" facility, where prisoners who are deemed the most dangerous and in need of the tightest control of all the prisoners within the United States Federal Prison System are housed.

[21] Trazodone (brand name Desyrel) is is used to treat depression, and also may also be used for relief of anxiety disorders (eg, sleeplessness, tension) and chronic pain. <http://www.drugs.com/trazodone.html>

(Dkt.# 33-5 at 43) (emphasis added).

Plaintiff's May 5, 2010 statement, given ten months after the alleged trauma of his 44-day stint in the multi-purpose room, does not assert any connection between his symptoms and his stay in the multi-purpose room; rather, he attributes his problems to a family history of similar issues and the stress of his then-ongoing prosecution for the October 7, 2007 incident at the prison.

As for his contention that he suffered "suicidal thoughts due to my conditions," the records do not support this claim either. Not only did he never voice this complaint during his 44-day stay in the multi-purpose room, on October 9, 2009, only three months after being transferred back to a regular cell in the SHU, during a routine B.O.P. health screen, he specifically denied suicidal ideation. (Dkt.# 33-4 at 42). During that screening, he was alert, oriented, appeared normal, was cooperative, had an appropriate mood and "normal" thought content, and made no mention of any gastrointestinal issue, backache, headache, anxiety or depression. (Dkt.# 33-4 at 4- 44). On April 29, 2010, almost nine months after the multi-purpose room stay, he first complained of the back pain he now alleges was a result of having to sleep on a mattress on the floor for 44 days. (Dkt.# 33-5 at 45). The medical records reveal that he reported he had had the low back pain "x1 year," indicating that the back pain began one month *prior to* his stay in the multi-purpose room from May 26 – July 9, 2009, and that he had a history of a motor vehicle accident at age 30. (Dkt.# 33-5 at 45).[22] On September 2, 2010, thirteen months after being placed back into a regular cell in the SHU, the plaintiff filed an Inmate Request to Staff, stating:

> I have requested many of times [sic] to MLP Azumah, M [sic] for a prognosis of nature [sic] and extent of treatment. Due to the painfull [sic] gas, migraine headaches, and lower back spasm/pains that goe's [sic] and comes. Asking that you give me a written prognosis consistent with my medical records and treatment. Please write this on my medical records . . .

(Dkt.# 1-4 at 65).

---

[22] Contrary to the plaintiff's claims of deliberate indifference to his medical needs, the records reveal that he received lower spine x-rays on May 13, 2010 which were negative. (Dkt.# 33-5 at 40).

In response, H. Boyles, Health Service Administrator co-signed the September 3, 2010 (illegible) signature of a B.O.P. health staff member who replied:

> After a review of your medical records, there are no significant findings that would need a prognosis. Your concerns appear to be unrelated to each other. If concerns arise report to sick call as needed.

(Id.).

Clearly, plaintiff has no serious medical condition, let alone any medical condition attributable to his stay in the multi-purpose room. Further, his complaints of staff deliberate indifference to minor or serious medical conditions are belied by his own medical records. Consistent with White v. Gregory, 1 F.3d 267, 269 *4th Cir. 1993)(prisoner's Eighth Amendment claim should be dismissed if he fails to allege a serious physical or mental injury resulting from the conditions of confinement), he has failed to state a claim for which relief can be granted against any of the defendants, and this claim, as well, should be dismissed.

## VII. Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that the defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment with its memorandum in support (Dkt.# 31 and 32) be **GRANTED;** the plaintiff's response in opposition, titled as "Memorandum of Law, Constitutional Rights, Civil Rights under 5[th], 8th, and 14th Amendments, B.O.P. Policy and, B.O.P. Prisons and Prisoners Administrative Law [sic]" (Dkt.# 39) be **DENIED** and the plaintiff's complaint be **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief can be granted.

Within **fourteen (14) days** after being served with a copy of this report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of such objections should also be submitted to the United States District Court. **Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal**

**from a judgment of this Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as reflected on the docket sheet. The Clerk is further directed to provide a copy of this Report and Recommendation to any counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: October 17, 2011

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE